HACKETT LAW PC
Kimberly Hackett (SBN 361071)
PO Box 121261
San Diego, CA, 92112
(619)-653-5236
kim@hackettlaw.net

Attorney for Plaintiffs JONATHAN BRIGHTMAN and COPY COM
DISTRIBUTION, INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JONATHAN BRIGHTMAN, an individual; COPY COM DISTRIBUTION, INC., dba INDEPENDENT CARTRIDGE SUPPLIER and CORPORATE PRODUCTS, a California Corporation, <br><br> Plaintiffs, <br><br> vs. <br><br> TOSHIBA AMERICA BUSINESS SOLUTIONS, INC., a California Corporation; TOSHIBA BUSINESS SOLUTIONS, a business entity of unknown form; and DOES 1-10, inclusive, <br><br> Defendants. | Case No.: <br><br><br> **COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES FOR VIOLATIONS OF:** <br><br> **(1) Sherman Act – Monopolization (15 U.S.C. § 2);** <br> **(2) Sherman Act - Attempted Monopolization (15 U.S.C. § 2); and** <br> **(3) Malicious Prosecution** |

Plaintiffs JONATHAN BRIGHTMAN and COPY COM DISTRIBUTION, INC., dba INDEPENDENT CARTRIDGE SUPPLIER and CORPORATE PRODUCTS ("Independent Cartridge"), files this Complaint against defendants TOSHIBA AMERICA BUSINESS SOLUTIONS, INC., ("TABS") and TOSHIBA BUSINESS SOLUTIONS ("TBS") to secure damages and injunctive relief, and demanding trial by jury, claims and alleges as follows:

## I.

## **INTRODUCTION**

1.    This action arises from an over decade-long campaign by TABS and TBS (collectively, the "Defendants") to attempt to monopolize the distribution channels of Toshiba brand original equipment manufacturer ("OEM") toner cartridges. Defendants' campaign culminated in the wrongful criminal prosecution and imprisonment of plaintiff Jonathan Brightman.

2.    Armed with a majority of the market share in the distribution of Toshiba brand OEM toner, Defendants monopolized and/or sought to monopolize by controlling the distribution channels, thus controlling the sales of Toshiba OEM toner, and suppressing competition. Defendants weaponized civil litigation, manipulated law enforcement investigations, and leveraged false and misleading information to eliminate a lawful competitor.

3.    Unable to prove any wrongdoing in civil court actions, Defendants shifted their focus to criminal law enforcement, feeding investigators a concoction of curated misleading documents and false sworn statements, including assertions of fraud conspiracy that had been rejected in previous civil proceedings. These submissions by Defendants omitted critical exculpatory rulings, and falsely linked Plaintiffs to misconduct.

4.    Defendants' covert influence tainted investigations by the Huntington Beach Police Department ("HBPD") and the United States Secret Service

COMPLAINT

("USSS"), and ultimately spurred federal prosecutors to indict plaintiff Brightman for conspiracy to commit mail fraud, and mail fraud.

5.    Plaintiff Brightman was convicted and imprisoned, spending 18 months in federal custody and was forced to shut down his business Independent Cartridge. However, in April 2024, the Ninth Circuit unanimously reversed all convictions.

6.    Defendants abused the court system to promote an anticompetitive behavior of excluding Plaintiffs from the distribution of Toshiba OEM toner.

## II.

## JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337. This court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state law claims because they are so related to the federal claim that they form part of the same case or controversy.

8.    This court has personal jurisdiction over Defendant TABS, and venue is proper in this District under 15 U.S.C. § 22, because Defendant TABS transacts substantial business in this District.

9.    This court has personal jurisdiction over Defendant TBS, and venue is proper in this District under 15 U.S.C. § 22, because Defendant TBS transacts substantial business in this District.

10.    Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to the claims occurred in this district.

## III.

## INTERSTATE TRADE AND COMMERCE

11.    The activities of Defendants, as described in this Complaint, occurred within the flow of interstate commerce, or substantially affected interstate commerce, or produced a direct, substantial, and reasonably foreseeable effect on

interstate commerce.

12.     Defendants engaged in interstate trade and commerce from facilities located in California and made sales to customers nationwide.

## IV.

## PARTIES

### A. Plaintiffs

13.     Plaintiff JONATHAN BRIGHTMAN is, and at all relevant times was, an individual residing in Santa Monica California. Plaintiff Jonathan Brightman is the founder of Copy Com Distribution, Inc., a telemarketing company established in or about May 2002, which operated under the additional dba names Independent Cartridge Supplier since 2011, and Corporate Products.

14.     Plaintiff COPY COM DISTRIBUTION INC., dba Independent Cartridge Supplier and Corporate Products ("INDEPENDENT CARTRIDGE"), at all relevant times was a business entity incorporated under the laws of the State of California, which has its principal place of business in Los Angeles, California. Plaintiff Independent Cartridge is engaged in the business of telemarketing for the sale of OEM toner. Plaintiffs and Defendants compete directly in the sale and distribution of Toshiba-brand OEM toner. Plaintiff Independent Cartridge sold OEM toner cartridges to businesses nationwide through telemarketing. These orders were fulfilled, shipped, and invoiced by a third-party distributor, G.N.M. FINANCIAL SERVICES, INC., dba IDC SERVCO, which collected customer payments, deducted applicable fees and costs, and remitted the remainder Independent Cartridge.

### B. Relevant Entities

15.     IDC SERVCO, during the relevant period, was owned and operated by Gilbert Michaels. IDC Servco, formerly known as MYTEL INTERNATIONAL ("MYTEL") operated in the toner distribution business since 1979. The company

4

was subject to ongoing oversight by the Federal Trade Commission ("FTC") and, despite extensive scrutiny, had never been formally charged in a criminal case prior to the events described in the complaint.

16.    GERALD FELDMAN served as the Vice President and Chief Operating Officer of both IDC Servco and Mytel during the relevant period.

**C. Defendants**

17.    Defendant TOSHIBA AMERICA BUSINESS SOLUTIONS, INC., is, and at all relevant times, was a corporation incorporated under the laws of the state of California and has its principal place of business in Lake Forest, California. Defendant is engaged in the business of selling, distributing, marketing, and soliciting, among other products, OEM toner. Defendant is a competitor of Plaintiffs. Defendant TABS is TBS's parent company. TABS provides a range of business solutions, including sales of toner to its authorized independent dealers, authorized distributors, and Toshiba brand product centers.

18.    Defendant TOSHIBA BUSINESS SOLUTIONS is a business entity of unknown form, doing business in the State of California. Based on a sworn declaration dated in 2014 by an individual purporting to be a Vice President of Toshiba Business Solutions, Plaintiffs are informed and believe that this entity is a subsidiary of defendant TOSHIBA AMERICA BUSINESS SOLUTIONS, INC. Plaintiffs will amend this complaint to state its true legal form and name when ascertained. Defendant TBS is engaged in the business of selling, distributing, marketing, and soliciting, among other products, OEM toner. Defendant TBS is a competitor of Plaintiffs. Defendant TBS distributes and sells Toshiba brand products, including toner, to retailers, distributors, and end users throughout the United States.

/ / /

/ / /

/ / /

# V.

## GENERAL ALLEGATIONS

### A. Defendants' Business Model

19.     Defendants TBS and TABS introduce Toshiba brand toner into the stream of commerce in four distinct ways: (a) Maintenance Agreements: TBS provides customers any and all reasonably necessary maintenance, including toner, in exchange for a monthly fee; (b) Business-to-Business Sales: TBS sells toner directly to businesses and individuals that do not wish to enter maintenance agreements. TBS sells toner to customers directly over the telephone; (c) Direct Sales to Authorized Independent Dealers: TABS sells toner to authorized independent dealers; (d) Direct Sales to Authorized Distributors: TABS sells toner to authorized distributors.

20.     Defendants maintain a nationwide network of 338 authorized dealer locations across all U.S. states and territories, as documented in its December 2024 Authorized Dealer List.[1]  This vast and tightly controlled distribution system allows Defendants to dictate who may sell its consumable supplies, including toner, and to exclude independent resellers who pose a threat to its aftermarket monopoly. The exclusivity of this network not only enables Defendants to control distribution channels, but identify, and retaliate against any independent reseller who seeks to compete outside of Defendants' approved distribution system.

21.     The sheer size of this network underscores Defendants' ability to coordinate messaging, collect documents, and mobilize dealer resources against competitors. This kind of coordinated foreclosure is a recognized form of

---

[1] Omnia Partners, *Toshiba Authorized Resellers, Authorized Dealers By State*, *Vendor Name: Toshiba America Business Solutions, Inc.*, (2024) https://www.omniapartners.com/suppliers-files/T-Z/Toshiba/Contract_Documents/R241204/R241204_Toshiba_Dealer_List_December_2024.pdf.

anticompetitive exclusion, as dominant firms often preserve monopoly power by raising rivals' costs and restricting their access to customers.[2]

22.    Defendants exploited this network to obtain copies of Plaintiffs' order confirmation forms and invoices (some unsigned or unexecuted) and to mischaracterize them as fraudulent submissions to law enforcement. Dealers, beholden to Defendants for their authorization and supply, acted as conduits to funnel unverified materials upward to Defendants, which in turn curated these submissions to fit a predetermined narrative of fraud. Through this coordinated mechanism, Defendants were able to transform ordinary commercial activity into purported evidence of criminality, thereby weaponizing their private distribution system to instigate baseless law enforcement action against Plaintiffs and suppress independent competition.

23.    A common form of anticompetitive exclusion works by limiting competitors ability to reach customers. Defendants' tactics exemplify this exclusionary strategy. By leveraging its nationwide network of authorized dealers, Defendants curtailed the ability of independent resellers such as Plaintiffs to access customers directly. Defendants instructed customers to forward Plaintiff's order confirmations and invoices, branded these routine documents as fraudulent, and then funneled them to law enforcement to stigmatize Plaintiffs' business. At the same time, Defendants' exclusive agreements and threats of enforcement discouraged customers from purchasing toner outside the dealer network. These coordinated actions reduced Plaintiff's access to end-users and effectively constrained consumer choice, not through superior products or lower prices, but through the deliberate foreclosure of independent distribution channels. Defendants even went as far as advising customers to refuse to pay competitor invoices and

---

[2] Jonathan B. Baker, *Exclusion as a Core Competition Concern*, 78 Antitrust L.J. 527, 529–30 (2007) (explaining that dominant firms frequently preserve monopoly power by mobilizing distribution networks to exclude rivals and raise their costs and emphasizing that such exclusion is the "core concern" of antitrust law).

COMPLAINT

encouraged customers to keep the product shipped by its competitors without payment.

**B. Industry Context and Competitive Threat**

24.     The primary market includes the hardware or equipment market. The aftermarket includes spare parts, service, and repair. There are three keys to an aftermarket: (1) the consumer purchases several, complementary components that work together as a system to provide value to the customer; (2) these components are purchased at different points in time; and (3) there is some degree of initial component(s) that cannot be recovered if the consumer later switches brands. In the case of Defendants, the initial component is the printer/copier/machine itself, and the components purchased later are the OEM toner required to keep the machine operating.

25.     Defendants' conduct falls squarely within the aftermarket framework recognized in antitrust law. While Toshiba competes in the foremarket for copiers and printers, its true profits are extracted in the aftermarket for toner and consumables. Customers cannot operate their Toshiba machines without these replacement supplies, and switching brands entails substantial sunk costs in equipment and training. This lock-in ensures that the Toshiba OEM toner aftermarket functions as a distinct market in which Defendants wield substantial market power independent of its position in the foremarket.

26.     The photocopier/printer industry, typically sell hardware at low margins or even below cost, relying instead on recurring revenues from toner and other consumables.[3]  This has long been characterized by a "razor-and-blades" business model: manufacturers sell or lease hardware at low margins, or even below cost,

---

[3] Carl Shapiro, *Aftermarkets and Consumer Welfare: Making Sense of Kodak*, 63 Antitrust L.J. 483, 495 (1995) (explaining that manufacturers often sell durable equipment at low margins or below cost and then exploit consumer lock-in by charging supracompetitive prices for associated consumables, such as toner or ink).

COMPLAINT

while generating substantial recurring revenues from toner and other consumables. This model depends on locking customers into long-term service agreements and proprietary supply chains, where consumables are distributed only through manufacturer-controlled channels.

27.    Independent sellers such as Plaintiffs represent a significant threat to this model—not because they undercut Defendants on price, but because they operated outside Defendants' distribution and contractual control. These sales disrupted Defendants' ability to enforce exclusivity, tie toner sales to maintenance contracts, and preserve aftermarket monopolization.[4]

28.    Plaintiffs' independence from Defendants' dealer system, among other things, enabled customers to purchase toner without being locked into Defendants' long-term agreements. This disintermediation posed a structural threat to Defendants' business model.

29.    Defendants' efforts to eliminate Plaintiffs were not motivated by concerns over consumer deception or pricing abuse, but by a desire to preserve monopoly control over aftermarket toner distribution and suppress unauthorized competition.

**C. Civil Litigation History**

1.    <u>The 1988 Order</u>

30.    In or around 1987, the FTC brought an action against Mytel, IDC Servco, Feldman and Michaels alleging that the parties engaged in deceptive marketing of photocopier and office supplies.

31.    In or around 1988, the litigation ended with the entry of a stipulated final order and judgment ("1988 Order") as to Mytel and Michaels. The 1988 Order

---

[4] *See generally Id.* at 487–493 (describing the "Surprise" and "Limited Manufacturer Commitment" theories of aftermarket power, whereby manufacturers exploit installed-base customers or bind dealers through contractual restrictions, thereby foreclosing independent supply options).

COMPLAINT

imposes several restrictions on Mytel and Michaels in connection with the marketing and sale of photocopier and office supplies. The most relevant restriction is found in Section 1 of the order which prohibits:

> *"[D]efendants, and all other persons or entities in active concert or participation with them who receive actual notice of this Order…from (a) representing in any matter that any of them is, represents or is affiliated with a consumer's regular or usual supplier of photocopier or office supplies,' unless such statement is true, and (b) representing in any manner that a consumer has a prior business relationship with any of them…."* [5]

2.    <u>TABS' Lawsuit Against IDC Servco</u>

32.    In or around 2007, TABS filed suit against IDC Servco in federal court, under the Lanham Act and the laws of the State of California with respect to alleged misuse of Toshiba's trade names and marks.[6]

33.    In or around July 31, 2007, shortly after the complaint was filed, the parties entered a stipulated judgment and permanent injunction in favor of TABS without trial, adjudication, finding on the issue of fact or law, and without admission of any of the allegations in the complaint.

34.    In or around September 24, 2007, TABS notified IDC Servco that they had allegedly violated the injunction.

35.    In or around October 20, 2007, IDC Servco responded by denying any illegal conduct and requested further documentation to allow them to investigate the allegations.

36.    In or around February 1, 2008, TABS filed its motion for contempt against IDC Servco. Around the same time as filing of the contempt motion,

---

[5] *Federal Trade Commission v. Mytel International, Inc., et al.*, (1987) Central District of California Case No. 2:87-07259, Dkt. No. 3-3.
[6] *Toshiba America Business Solutions, Inc., v. G.N.M Financial Services, Inc., et al.,* (2007) Central District of California Case No. 8:07-cv-00862.

COMPLAINT

representatives from TABS exchanged numerous email correspondences with representatives from the Better Business Bureau ("BBB") in which TABS sought the assistance of BBB in their campaign to take-down IDC Servco and the sales companies, including Plaintiff Independent Cartridge. TABS expressed to the BBB that it was presently taking legal actions against IDC Servco but were "running into some difficulties in going the next step." TABS further explained that its "legal department has put a lot of effort into building a history" but it was "being told that we cannot take action against IDC Servco as they are not affiliated with the sales companies that are contacting our customers." The BBB suggested that TABS contact the local District Attorney's Office for further assistance.

37.    In or around February 19, 2008, TABS contempt motion was denied by the Central District of California because TABS had not met its burden of proving a violation of the injunction by clear and convincing evidence. TABS failed to prove that the independent sales companies, which included plaintiff Independent Cartridge, acted in concert with IDC Servco to violate the injunction.

38.    In or around May 12, 2008, after TABS was unsuccessful with its contempt motion, counsel for IDC Servco wrote to TABS' counsel to discuss ways to avoid further litigation. IDC Servco was willing to voluntarily institute a requirement whereby written order confirmations would be required on all orders and would include language explicitly stating that the sales companies had no relationship whatsoever with TABS. Following this correspondence, plaintiff Independent Cartridge used the IDC Servco proposed order confirmation that included the disclaimer:

**INDEPENDENT CARTRIDGE SUPPLIER**
7119 W Sunset Blvd. #656,  Los Angeles, CA 90046  Tel: 877-502-7715  Fax: 800-438-7511

*~ ORDER CONFIRMATION ~*

**PLEASE FORWARD IMMEDIATELY TO: _____**

*YOU HAVE PLACED AN ORDER FOR OFFICE SUPPLIES WITH INDEPENDENT CARTRIDGE SUPPLIER, A TELEMARKETING FIRM UNAFFILIATED WITH TOSHIBA. PRICES MAY NOT BE THE SAME AS YOU PAY FROM YOUR REGULAR SUPPLIER.*

11

39.    For at least five years following Defendants' failed contempt motion, Defendants continued to collect evidence against Plaintiffs and others to continue its crusade against Plaintiffs.

3.    <u>The FTC Litigation</u>

40.    In or around July 18, 2012, the Huntington Beach Police ("HBPD") allegedly received a phone call from a purported owner of a storage company in Arizona claiming that he had received a fake invoice for printing cartridge toner from another separate company named "Inventory Distribution Center" that was never purchased. Following the report, HBPD opened an investigation into fictitious billing. Later, HBPD gathered information from the Orange County District Attorney's Office, all having to do with customer complaints of being invoiced for toner that the customers never ordered.

41.    In or around August of 2012, HBPD enlisted the assistance of the United States Secret Service ("USSS") to further investigate the customer complaints of fictitious billing for toner. USSS was able to obtain and provide relevant bank statements and financial records of Inventory Distribution Center to further the investigation. Eventually, HBPD executed a search warrant on Inventory Distribution Center and spoke to the company's owner, Scott Bishop, who allegedly mentioned IDC Servco as being a "major local business hub in the toner industry." HBPD also found documents during the execution of the search warrant that linked IDC Servco as being Inventory Distribution Center's supplier of toner.

42.    In or around February 2013, an executive of TABS, Tom Walters met with the HBPD to provide a statement regarding an ongoing investigation into alleged fictious billing by Inventory Distribution Center. During the interview, Walters described TABS' "*several civil legal actions against Gilbert Michaels and his associated companies for fraudulently reporting to consumers that he was affiliated with Toshiba in order to send fake invoices that were followed by payment demands*." Walters further purported to HBPD that TABS was aware that

Michaels operated approximately 30 companies that act as "telemarketer boiler rooms" that "further the fraudulent scheme." Walters' statement to HBPD in his official capacity as TABS executive contradicted TABS position back in 2008 when it ran into difficulties in their legal crusade against IDC Servco and sought out the assistance of the BBB. The statement also changed the course of the investigation from the original fictitious billing inquiry into a larger fraud conspiracy.

43.    Throughout the HBPD and USSS investigation, investigators from HBPD shared information obtained in their investigation of IDC Servco to TABS, going as far as to provide TABS with requested information concerning where IDC Servco purchased the Toshiba brand OEM toner to fulfill orders.

44.    Defendants continued to provide law enforcement information that was irrelevant and not publicly available, including documentation concerning IDC Servco that predated the 1988 Order.

45.    In or around May 2013, the HBPD executed a search warrant on several Orange County-based telemarketing firms that dealt with IDC Servco. Evidence provided by Defendants was used in obtaining the search warrant. The HBPD warrant was based on the same theory previously rejected in the 2007 proceedings TABS instigated, that IDC Servco acted in concert with the independent sales companies in violating the injunction. While Plaintiffs were not initial targets, Plaintiffs became one only after Defendants supplied its curated evidentiary package. Notably, the detective testified he had even sought the Los Angeles Police Department's assistance in conducting raids, but it refused to participate.

46.    In or around March 14, 2014, TBS Vice President, Jim Hawkins, provided HBPD a misleading sworn declaration after reviewing pricing information of IDC Servco and the independent sales companies, including plaintiff Independent Cartridge, provided to Hawkins by HBPD. Hawkins, acting in his professional capacity on behalf of TBS, declared under penalty of perjury

that the pricing information was "grossly excessive within the toner industry", failing to account for the fact that the maximum assignable pricing Hawkins referenced did not accurately reflect the actual prices that Plaintiff sold the Toshiba toner.

47.    In or around April of 2014, the Federal Trade Commission (FTC) brought an action for contempt against IDC Servco and others, for allegedly violating the relevant 1988 Order. The FTC action alleged that IDC Servco violated the 1988 Order by using independent sales companies (the same theory rejected in TABS' 2007 litigation), among the companies listed was plaintiff Independent Cartridge. The FTC sought order for compensatory relief of $128,000,000.00 and the imposition of coercive sanction of incarceration.

48.    The FTC used information obtained in the HBPD and USSS investigation, including the statements made by TABS to HBPD falsely claiming that IDC Servco used the independent sales companies to further a purported fraudulent scheme.

49.    In or around May of 2014, attorneys for TBS and TABS, through numerous and extensive email correspondences, provided HBPD legal case law, and legal interpretations of such cases, concerning confidentiality of records seized pursuant to a search warrant, notably to assist in the HBPD's investigative role in the relevant FTC litigation.

**D.  The Criminal Case**

50.    In or around March 15, 2013, the United States Attorney Office for the Central District of California issued a federal grand jury subpoena to TABS to provide documents pertaining to Gilbert Michaels, IDC Servco, G.N.M Financial Services, Inc., and Mytel International Inc., with the specific request to include (but not limited to), "consumer complaints" and "record of any civil actions against the companies and or its affiliates."

51.    In or around January 16, 2014, HBPD met with TABS' director, Tom

Walter and counsel for TABS in connection with the HBPD investigation into IDC Servco. Walter advised HBPD that Toshiba desired to assist in the investigation.

52.     In or around January 29, 2014, a search warrant was issued ordering TABS to assist in the investigation and to provide documents in their possession.

53.     In or around February 20, 2014, HBPD met with Walter and TABS's counsel to provide HBPD with a thumb drive of documents requested under the issued search warrant. Included in the documents provided were documents from the 2007 contempt motion litigation by TABS against IDC Servco. Conveniently, TABS omitted from its production of litigation documents the unfavorable (for TABS) 2008 district court ruling denying TABS' contempt motion.

54.     In June 2016, Plaintiff Jonathan Brightman was indicted in the Central District of California, along with 19 other defendants (including Gilbert Michaels), for mail fraud under 18 U.S.C. § 1341 and conspiracy to commit mail fraud under 18 U.S.C. § 1349.

55.     As detailed in the official Department of Justice U.S. Attorney's Office Central District of California press release dated June 28, 2016, "*this case originated from the initiative of the Huntington Beach Police Department…their long-term partnership and steadfast collaboration with the Secret Service…*".[7]

56.     Discovery during Plaintiff's criminal proceedings revealed Toshiba's behind-the-scenes coordination with federal and local authorities, including:

a)  Subpoenaed emails showing TBS/TABS supplied law enforcement with curated documents omitting unfavorable court rulings;

b)  False claims by TABS Vice President Jim Hawkins, through sworn affidavit, that TABS did not engage in cold calling (contrary to job listings);

c)  TBS/TABS curated predetermined consumer complaints. These pre-filled

---

[7] Press Release, U.S. Dep't of Just., *23 People Indicted in Decades-Long, $126 Million Telemarketing Scheme involving Sale of Toner for Copiers and Printers* (Jun. 28, 2016), https://www.justice.gov/usao-cdca/pr/23-people-indicted-decades-long-126-million-telemarketing-scheme-involving-sale-toner.

COMPLAINT

forms mirrored elements of mail fraud charges by including allegations of quality or authenticity defects, discrepancies in quantity, and claims that no order had been placed. However, no evidence was presented at trial to substantiate any defects or fraudulent billing because this was not Plaintiffs' business practice:

    i.    TBS representatives would provide alleged "victim" customers a pre-filed out complaint form on TBS letterhead:

Hi Martina,

Here is the letter I spoke with you on the phone about. Also please read below what our Security/Legal team advises.

I am glad to see that the customer contacted you when receiving the call and invoice. It is important your customer does not pay the invoice and if product was received, that they do not have to send it back at their expense. It will be important to provide notification to the company if product is received to allow them to pick up the merchandise if they are interested and to also prevent ongoing communications from that company with past due notices. Attached is a sample document to use for that notification along with information about these operations.

Thank you for your support.

If you have any questions my contact information is below, and if could scan me a copy of that invoice I will forward to legal.

Thanks
**Michelle Stanfield**
**Supply Account Sales Manager - IL/IN  Marketplace**

**Toshiba Business Solutions | AV Solutions**
Direct: 502.489.6783 Toll Free: 888-855-1924 x 6783

www.tbs.toshiba.com | www.avsolutionsny.com

 

    ii.    The customer that received the complaint form curated by Defendants would simply need to enter the date and the customer's business contact information;

/ / /

/ / /

/ / /

16

COMPLAINT

**TOSHIBA**

TOSHIBA AMERICA BUSINESS SOLUTIONS, INC.

Date


Name
Title
Address
City, State, Zip

Dear _____:

I am the purchasing office for (your company's name). We received (amount) of (toner or developer) from your company. Please be on notice that we do not accept the product shipped to us because of the unfair manner in which your company attempted to market itself as our normal supplier of these products. We are returning the product for the following reasons:

1. Misrepresentation of our normal supplier.
2. Potentially inferior quality of delivered goods.
3. Quantity of delivered goods does not conform to the telephone conversation.
4. The goods were never ordered.
5. The goods were grossly overpriced.

We require that you arrange to have the (toner or developer) picked up and returned to your business establishment. We will hold the shipment for pick-up within 30 days after your receipt of this letter. If the goods are not picked up within the time period, we will be forced to dispose of the goods.

Any future correspondence from your company to ours must be in writing. If you have (your company's name) on your records for any future orders, please cancel those orders as none have been made.

Sincerely,



(Your name)
(Your company's name)

    iii.     the customer would take the form and either swap out Defendants' letterhead for the customer's own letterhead, or in some instances, would leave the complaint form on Defendants' letterhead:

/ / /

/ / /

/ / /

17

COMPLAINT

**MDA**
Muscular
Dystrophy
Association
**Fighting Muscle Disease**

3300 East Sunrise Drive, Tucson, AZ 85718-3299
Tel. (520) 529-2000 • Fax (520) 529-5300
mda.org • mda@mdausa.org

January 30, 2014

**IDCSERVCO**
**Attention: Accounts Receivable**
3962 Landmark Street
**PO Box 1925**
Culver City, CA 90232-1925
Fax Number: 800-335-3962

Dear IDCSERVCO:

I am the Vice President for the Muscular Dystrophy Association. We received eight toner cartridges for a Toshiba E-352 Copier in our **Arizona District Office located at 4500 South Lakeshore Drive #440, Tempe, AZ 85282** from your company. Please be on notice that we do not accept the product shipped to us because of the unfair manner in which your company attempted to market itself as our normal supplier, of these products. We are returning the product for the following reasons:

1. Misrepresentation of our normal supplier.
2. Potentially inferior quality of delivered goods.
3. Quantity of delivered goods does not conform to the telephone conversation.
4. The goods were never ordered.
5. The goods were grossly overpriced.

We require that you arrange to have the toner (stock number 6381) picked up and returned to your business establishment. We will hold the shipment for pick-up within 30 days after your receipt of this letter. If the goods are not picked up within the time period, we will be forced to dispose of the goods.

Any future correspondence from your company to ours must be in writing. If you have the Muscular Dystrophy Association on your records for any future orders, please cancel those orders as none have been made.

Sincerely,

Hope C. Townsend, Vice President of Operations Services
Muscular Dystrophy Association, National Headquarters

/ / /
/ / /
/ / /
/ / /
/ / /
/ / /

18

COMPLAINT

**TOSHIBA**

TOSHIBA AMERICA BUSINESS SOLUTIONS, INC.

February 24, 2015

Binghamton University
Multicultural Resource Ctr.
4400 Vestal Parkway East
Binghamton, NY 13902

Dear   IDC Servco:

I am the purchasing office for  MRC/Binghamton University We received  1 each of toner
from your company.  Please be on notice that we do not accept the product shipped to us because of
the unfair manner in which your company attempted to market itself as our normal supplier of these
products.  We are returning the product for the following reasons:

1. Misrepresentation of our normal supplier.
2. Potentially inferior quality of delivered goods.
3. Quantity of delivered goods does not conform to the telephone conversation.
4. The goods were never ordered.
5. The goods were grossly overpriced.

We require that you arrange to have the (toner or developer) picked up and returned to your business
establishment.  We will hold the shipment for pick-up within 30 days after your receipt of this letter.
If the goods are not picked up within the time period, we will be forced to dispose of the goods.

Any future correspondence from your company to ours must be in writing.  If you have  Multicultural Resource Ctr.
Binghamton University   ) on your records for any future orders, please cancel those orders as none have been
made.

Sincerely,

*Michele Hayes*

Michele Hayes
MRC/Binghamton University

d) Email correspondence from TABS to law enforcement thanking them for
their role in the prosecution and expressing that supposed justice had been
achieved after a ten-year campaign:

/ / /

/ / /

/ / /

19

COMPLAINT

From:      Tom Walter/EID/IRV/TOSHIBA-TABS
To:        KKesler@hbpd.org
Date:      06/29/2016 03:36 PM
Subject:   Congratulations and thank you very much!!! -- IDC/Servco

Hi Kevin,

We can't thank you enough for your dogged persistent regarding IDC/Servco and we're thrilled to see that Gilbert Michaels has finally been incarcerated. It couldn't have happened to a more deserving undesirable.

http://m.ocregister.com/articles/beach-720806-idc-toner.html

http://www.businesswire.com/news/home/20070821005378/en/Toshiba-America-Business-Solutions-Wins-Stipulated-Judgment

Take care,

Tom

Thomas H. Walter
V.P - Distribution & Aftermarket Sales
Toshiba America Business Solutions, Inc.
9740 Irvine Blvd.

Subject: Appreciation and Commendations

Dear Chief Handy,

I wanted to reach out to you directly to offer Toshiba America's continued support and sincere gratitude for the work conducted by your department regarding the IDC/Servco criminal matter. We've had both esteemed honor and sincere privilege to work with several members of your team whom we would like to recognize by name.
1. Detective Kevin Kesler
2. Sergeant Yasha Nikitin
3. Detective David Humphreys

As you may know. Toshiba America has been fighting for justice in this matter for more than 10 years and if not for the dedicated efforts of the team mentioned above, IDC/Servco would continue defrauding the American populous of many millions of dollars. For this we are eternally grateful and prepared to continue fighting this cause for as long as it takes.

For the receord, Toshiba America is NOT directly damaged by the activites of IDC/Servco, but dozens of our loyal customers have severely harmed over the years. For Toshiba this a fundmental fight about right versus wrong, good versus evil, not economic gain for a corporate conglamerate. With the direct assistance from the HBPD we are collectively fighting the "good fight."

If you have the time, I would relish the opportunity to meet with you in person to thank you persoanlly for your team's outstanding efforts in this matter.

BTW, I'm a longtime resident of HB who has raised 5 children in the community and I'm very proud to have such fine representation at the HBPD.

Kindest regards,

Tom

Thomas H. Walter
V.P - Distribution & Aftermarket Sales
Toshiba America Business Solutions, Inc.
9740 Irvine Blvd.
Irvine, CA 92618
Phone: (949) 462-6080
Cell: (714) 604-5807
tom.walter@tabs.toshiba.com

20

COMPLAINT

     iv.    Notably, despite TABS executive Tom Walter claiming on behalf of TABS that TABS was not directly damaged, evidence provided to plaintiff Brightman in his discovery during the criminal case labels Defendants as a purported "victim" through the voluminous evidence Defendants provided to law enforcement.

e) Correspondence from TBS' counsel falsely stating that Plaintiffs continued to attempt to collect upon a debt for orders that were never placed by various customers.

f) Manipulation of order confirmation forms: TABS/TBS obtained a set of approximately fifteen order confirmation forms and invoices related to Plaintiff's company. These documents, some of which were unexecuted or unsigned, were gathered by Defendants from its dealer network—who in turn collected them from Defendants' own customers—and forwarded to law enforcement. Defendants falsely claimed that these documents supported a pattern of unauthorized billing or collection attempts, despite the absence of supporting evidence showing that any actual orders had been placed or misrepresentations made.

g) Misleading pricing comparisons: TABS' Hawkins submitted declarations comparing the prices of IDC Servco's products to the maximum assignable pricing listed in IDC Servco's internal catalog—rather than to the actual prices charged to customers. These internal catalog prices served only as administrative ceilings and did not reflect the terms of real transactions. Defendants' price comparisons were therefore materially misleading.

57.    Despite Toshiba's assertions that Plaintiff's sales practices were fraudulent, neither the HBPD nor the USSS conducted an independent review of the business records. Instead, investigators accepted Toshiba's representations at face value without verifying whether the order confirmations or invoices were in

fact fraudulent or misleading.

58.     Defendants' referral of incomplete and misleading information to law enforcement were not a good-faith effort to report wrongdoing, but an effort to weaponize public agencies to achieve anti-competitive goals. This is particularly evident given Defendants' history of litigation defeats (in 2008), and Defendants' concealment of the adverse ruling from investigators.

59.     Plaintiff Brightman proceeded to a jury trial, which lasted six weeks. At trial, law enforcement testified that it had relied on the evidence provided by TABS and TBS. Additional trial testimony confirmed that the customers of Plaintiff's company, in some instances, received a discount in price from ordering toner from Plaintiff rather than TABS/TBS.

60.     Ultimately, the trial concluded in Plaintiff Brightman's conviction and a sentence of 30 months in federal prison and five years of probation.

61.     Plaintiff Brightman served 18 months in federal custody, during which time he missed the funerals of his mother, brother, and domestic partner, and was unable to provide care for his surviving disabled sibling.

62.     In or around April 9, 2024, the Ninth Circuit Court of Appeals unanimously reversed plaintiff Brightman's conviction, as well as all other defendants' convictions (including Michaels' and other cooperating witnesses), holding that the government's fraud theory was legally and factually insufficient. The Ninth Circuit found that the alleged misrepresentations made by the sales companies did not meet the legal standard of materiality required for fraud, and that customers had received the benefit of the bargain, and for a misrepresentation to secure a sale to constitute fraud, it must "*go to the nature of the bargain*", which the Ninth Circuit held was not the case in plaintiff Brightman's case. Additionally, the Ninth Circuit reiterated that:

/ / /

/ / /

"[t]here was no evidence presented at trial suggesting that any businesses did not receive the toner or that any of the toner had defects."[8] The Ninth Circuit unanimously reversed and remanded to the district court for further proceedings.

*63.* In or around May 8, 2024, the district court held a remand hearing to inquire of the parties whether the court should "*take any actions…with regard to the defendants who have plead out before trial*" and if there was "*any reason why* [the district court] *shouldn't issue an Order to Show Cause why the convictions of all the other defendants should likely be withdrawn*". The government claimed it could still make a case, but the district court seemingly disagreed and stated that "*the Ninth Circuit found the government's evidence insufficient, and* [the government doesn't] *get a do-over regardless of what the theory is. [The Ninth Circuit] very clearly said the evidence was insufficient*."[9]

64. Defendants' enforcement efforts were objectively baseless—courts previously rejected the same theories in 2008, and the Ninth Circuit reversed related fraud convictions as legally insufficient in 2024—yet Defendants persisted with the subjective intent to suppress independent resale and preserve their aftermarket monopoly by leveraging law enforcement processes to foreclose competition.

65. In or around July 22, 2024, the government filed a Motion to Dismiss the criminal case against plaintiff Brightman and other co-defendants.

66. In or around July 24, 2024, the district court issued an Order Granting the government's Motion to Dismiss Indictment against all defendants, including plaintiff Brightman.

67. Due to the criminal proceedings, plaintiff Brightman was forced to cease operations of plaintiff Independent Cartridge.

---

[8] *U.S. v. Milheiser*, 98 F.4th 935, 945 (9th Cir. 2024).
[9] *See generally U.S. v. Brightman*, Case No. 8:16-cr-00076-JVS, Central Dist, of Cal., Dkt. No. 1928 (hearing transcript May 8, 2024).

**E.  The 2014 FTC Litigation Continued**

68.    In or around April 2022, the court lifted the stay placed on the FTC's litigation while the criminal proceeding was pending.

69.    In or around December 2023, the FTC filed a motion for summary judgment against one of the defendants, Feldman, following his guilty plea in the relevant criminal case that was ultimately overturned.

70.    In or around March 2025, this Court denied the FTC's motion for summary based on the FTC's failure to make out a violation of the 1988 Order. This Court reasoned that the FTC's factual allegations do not establish that Feldman acted through any corporation, specifically the independent sales companies which include plaintiff Independent Cartridge, in violation of the 1988 Order. The Court explained that the uncontested facts establish that Feldman had no authority to control plaintiff Independent Cartridge, or any of the other independent sales companies.

**VI.**

**<u>CLAIMS FOR RELIEF</u>**

**FIRST CAUSE OF ACTION**

**(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Monopolization)**

**(All Defendants)**

71.    Plaintiffs repeats, realleges and incorporates by reference each of the allegations referenced in the paragraphs above as if fully set forth herein.

72.    Beginning at least in 2010 and continuing through the present, Defendants have entered into and enforced exclusive dealer arrangements and restrictive supply agreements with Toshiba-authorized dealers, which have had the anticompetitive effects alleged in this Complaint.

73.    The relevant product market is the aftermarket for Toshiba-brand OEM toner distribution used in Toshiba copiers and printers.

74.    The relevant geographic market is across the United States, where

Defendants distribute Toshiba-brand OEM toner through its nationwide network of 338 authorized dealers, among other distribution channels Defendants control.

75.    Defendants possess monopoly power in the relevant market, maintaining a market share of over 75% of the distribution of Toshiba-brand toner sales as measured by sales volume.

76.    Defendants have the power to control prices and exclude competition in the relevant market as evidenced by a) their ability to dictate the resale practices of 338 authorized dealers nationwide; (b) proprietary cartridge designs and embedded microchips that prevent the use of non-Toshiba toner; and (c) sham enforcement efforts and manipulated referrals to law enforcement that suppressed independent resellers.

77.    Defendants have monopolized the relevant market, and willfully acquired and maintained its monopoly power in the relevant market through exclusionary and anticompetitive practices set out in this Complaint. Defendants have engaged in these practices to (a) unlawfully maintain and enhance its monopoly in the relevant market and keep prices high; and (b) stifle competition and eliminate consumer choice through exclusionary practices designed to keep Plaintiffs and other competitors and potential competitors from competing, or weak, or unable to achieve a minimum efficient scale of production or operation needed to serve as viable competitors in the relevant market.

78.    The effect of Defendants' exclusionary and anticompetitive conduct has been to substantially lessen competition in the relevant market and has created a monopoly in the relevant market by substantially foreclosing competitors from access to customers comprising the vast majority of the market.

79.    Defendants' exclusionary and anticompetitive conduct has harmed competition and injured consumer welfare by among other things:

(a) Decreasing competition and the suppliers available to customers in the relevant market;

COMPLAINT

(b) Substantially raising entry barriers in the relevant market;

(c) Foreclosing independent resellers from access to customers;

(d) Suppressing price competition and increasing the price paid by customers to the relevant market;

(e) Denying customers and the public full and fair competition in the market; and

(f) Enabling Defendant to maintain monopoly power in the relevant market.

80.   Defendants' conduct alleged in this Complaint constitutes monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

81.   Defendants' monopolization conduct has continued into the limitations period through specific, ongoing acts that occurred within four years of the filing of this Complaint, including the ongoing dissemination of misleading pricing comparisons and sham cease-and-desist letters, and the submission of incomplete or unreliable materials to law enforcement and regulators culminating in the false prosecution and imprisonment of Plaintiff Brightman, and the foreclosure of his company. These acts independently inflict new and accumulating harm on Plaintiffs and the market, thereby rendering this action timely under the continuing-violation doctrine.

82.   Defendants' exclusionary conduct has injured Plaintiffs by, among other things: (a) Foreclosing it from access to potential customers; substantially decreasing its business volume and revenue; and decreasing the profitability of its business; (b) Substantially reducing present and future opportunities for Plaintiff to deal with customers in the relevant market; (c) Decreasing the profitability and value of its business; and (d) Increasing Plaintiff's costs.

83.   As a direct and proximate result of Defendants' illegal conduct alleged in this Complaint, Plaintiffs have been injured in its business and property in an amount to be determined at trial but believed to be more than $10,000,000.00.

84.   Unless restrained by an order of this Court, Defendants will continue to

monopolize the relevant market in violation of Section 2 of the Sherman Act.

85.    As a direct and proximate result of Defendants' continued threatened conduct alleged in this Complaint, Plaintiffs are threatened with additional loss or damage to its business and property for which monetary compensation alone is not an adequate remedy.

86.    As a direct and proximate result of Defendants' illegal conduct and continued threatened conduct alleged in this Complaint, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

87.    Plaintiffs are entitled to damages in an amount to be proven at trial, but exceeding $10,000,000.00, which damages should be trebled, attorney's fees, costs of suit and post-judgment interest.

88.    Plaintiffs are entitled to a permanent injunction terminating Defendants' ongoing violations alleged in this Complaint, enjoining Defendants from engaging in exclusionary practices, and requiring Defendants to cease foreclosing independent resellers from access to the distribution of Toshiba-brand OEM toner aftermarket.

## SECOND CAUSE OF ACTION

### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, Attempted Monopolization)

### (All Defendants)

89.    Plaintiffs repeats, realleges and incorporates by reference each of the allegations referenced in the paragraphs above as if fully set forth herein.

90.    Beginning in at least 2010, and continuing through April 2024, Defendants engaged in conduct that constitutes attempted monopolization under Section 2 of the Sherman Act, 15 U.S.C. § 2. Defendants have willfully attempted to extend monopoly power in the aftermarket for Toshiba-brand toner by foreclosing independent competitors, disseminating false information, and abusing

regulatory and criminal processes. Such conduct has harmed consumers by inflating toner prices, eliminating independent sources of supply, and coercing customers into long-term maintenance and supply contracts.

91.    The relevant product market is the aftermarket distribution of Toshiba brand OEM toner.

92.    The relevant geographic market is nationwide.

93.    Defendants have a market share of at least 70% in the relevant market as measured by sales, revenues, units sold, and maintain a nationwide network of 338 exclusive authorized dealer locations. This tightly controlled dealer network enables Defendants to dictate who may sell Toshiba consumable supplies, to exclude independent resellers, and to coordinate messaging, evidence-gathering, and enforcement actions against perceived competitive threats.

94.    If Defendants do not already possess monopoly power in the relevant market, there is a dangerous probability that Defendants will acquire the power to control prices and exclude competition in the relevant market, as indicated by its market share and other indicia of ability to exclude competitors.

95.    Defendants have willfully, knowingly, intentionally and with the specific intent to do so, attempted to monopolize the relevant market. Defendants have acted with the purpose of, and the conscious objective of, acquiring the power to control distribution channels and ultimately price and exclude competition in the relevant market. Defendants engaged in the anticompetitive conduct alleged in this Complaint with the specific intent to restrict competition against it, restrict competition in the relevant market and harm Plaintiffs and other competitors, actual and potential.

96.    Beginning in about February 2013 and continuing to about April 2024, Defendants engaged in conduct yielding anticompetitive effects in order to (a) maintain and enhance its market power and to obtain monopoly power in the relevant market; and (b) stifle competition and eliminate consumer choice through

exclusionary practices designed to keep Plaintiffs and other competitors and potential competitors from competing, or weak, in the relevant market.

97. Defendants willfully, knowingly, and with the specific intent to monopolize, engaged in a pattern of exclusionary and anticompetitive conduct, including but not limited to:

a) Sham Enforcement Actions - issuing an October 2010 cease-and-desist letter containing factually false and grossly exaggerated claims, designed to intimidate and eliminate Plaintiffs from the market, rather than to protect legitimate intellectual property rights.

b) Manipulation of Evidence - submitting materially misleading pricing comparisons by using internal catalog "ceiling" prices instead of actual transaction prices; mischaracterizing unsigned or unexecuted order confirmation forms as proof of fraudulent billing; and omitting exculpatory court rulings from litigation document productions.

c) Coordination with Law Enforcement and Regulators - maintaining premeditated and ongoing communications with sympathetic FTC personnel and selectively providing curated evidentiary packages to the Huntington Beach Police Department (HBPD) and United States Secret Service (USSS), knowing these agencies would accept such submissions without independent verification.

d) Weaponization of Exclusive Dealer Network - mobilizing a nationwide network of 338 authorized dealer locations to collect and funnel documents to law enforcement, label lawful transactions as fraudulent, and thereby instigate raids, indictments, and criminal prosecutions.

98. Defendants' exclusionary and anticompetitive conduct has harmed competition and injured consumer welfare by among other things:

a) Decreasing competition and the suppliers available to customers in the relevant market;

b) Substantially raising entry barriers for potential competitors;

c) Foreclosing Plaintiffs and other independent resellers from access to customers;

d) Suppressing price competition and increasing customer costs;

e) Depriving consumers of the benefits of independent, non-TABS/TBS-controlled Toshiba-brand OEM toner distribution.

These effects resulted in higher toner prices, reduced independent supply options, coerced maintenance tie-ins, and diminished innovation in the aftermarket.

99.    Defendants' conduct alleged in this Complaint constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

100.    Defendants' monopolization conduct has continued into the limitations period through specific, ongoing acts that occurred within four years of the filing of this Complaint, including the ongoing dissemination of misleading pricing comparisons and sham cease-and-desist letters, and the submission of incomplete or unreliable materials to law enforcement and regulators culminating in the false prosecution and imprisonment of Plaintiff Brightman, and the foreclosure of his company. These acts independently inflict new and accumulating harm on Plaintiffs and the market, thereby rendering this action timely under the continuing-violation doctrine.

101.    Defendants' exclusionary conduct has injured Plaintiffs by, among other things:

a) Foreclosing it from access to potential customers; substantially decreasing its business volume and revenue; and decreasing the profitability of its business;

b) Substantially reducing present and future opportunities for Plaintiffs to deal with customers in the relevant market; and

c) Decreasing the profitability and value of its business.

102.    As a direct and proximate result of Defendants' exclusionary conduct,

Plaintiffs suffered substantial injury, including the loss of customers, significant declines in business volume and revenue, destruction of goodwill, and the forced closure of Plaintiff Independent Cartridge Supplier. The damages exceed $10,000,000.00, subject to proof at trial, and should be trebled under 15 U.S.C. § 15.

103.    Plaintiffs further allege that Defendants' conduct continues to pose a threat of future harm to competition and consumer welfare by preserving and reinforcing monopoly power in the relevant market.

104.    As a direct and proximate result of Defendants' illegal conduct and continued threatened conduct alleged in this Complaint and under this First Cause of Action, customers and the public have been deprived of the benefits of full and fair competition in the relevant market.

105.    Plaintiffs are entitled to damages in an amount to be proven at trial, but exceeding $10,000,000.00, which damages should be trebled, attorneys' fees, costs of suit and post-judgment interest.

## THIRD CAUSE OF ACTION
### Malicious Prosecution (California Law)
### (All Defendants)

106.    Plaintiffs repeats, realleges and incorporates by reference each of the allegations referenced in the paragraphs above as if fully set forth herein.

107.    That defendants Toshiba Business Solutions and Toshiba America Business Solutions were actively involved in causing plaintiff Jonathan Brightman to be arrested and prosecuted;

108.    That the criminal proceeding ended in plaintiff Jonathan Brightman's favor;

109.    That no reasonable person in defendants Toshiba Business Solutions and Toshiba America Business Solutions' circumstances would have believed that there were grounds for causing plaintiff Jonathan Brightman to be arrested and

prosecuted;

110.    That defendants Toshiba Business Solutions and Toshiba America Business Solutions acted primarily for a purpose other than to bring Plaintiff Jonathan Brightman to justice;

111.    That defendants Toshiba Business Solutions and Toshiba America Business Solutions' conduct were a substantial factor in causing Plaintiff Jonathan Brightman's harm.

112.    That defendants supplied law enforcement with materially misleading pricing comparisons, unexecuted order confirmation forms, declarations based on triple hearsay, and curated customer complaint forms it had drafted and circulated through its dealer network.

113.    That despite this, law enforcement accepted Toshiba's representations without conducting independent validation.

114.    That defendants' actions demonstrate that Defendants lacked probable cause and acted with malice, seeking to eliminate a lawful competitor rather than to vindicate legitimate legal rights.

115.    That plaintiffs are entitled to damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray judgment as follows:

1.  On each and every Cause of Action, adjudicates and decrees that Defendant's conduct alleged herein violates the laws alleged in this Complaint;

2.  On the First Cause of Action (Violation of Section 2 of the Sherman Act), awards Plaintiffs threefold damages in an amount to be proved, but believed to be more than $10,000,000, trebled, plus attorneys' fees and costs of suit, and permanent injunctive relief prohibiting Defendants from engaging in exclusionary conduct, including but not limited to exclusionary dealer arrangements, sham enforcement activity, or other practices designed to foreclose independent resellers from the Toshiba OEM toner aftermarket;

3.  On the Second Cause of Action (Violation of Section 2 of the Sherman Act), awards Plaintiffs threefold its damages in an amount to be proved, but believed to be more than $10,000,000, plus attorneys' fees and costs of suit, and a permanent injunction prohibiting Defendants from engaging in exclusionary conduct, including but not limited to exclusionary dealer arrangements, sham enforcement activity, or other practices designed to foreclose independent resellers from the Toshiba OEM toner aftermarket;

4.  On the Third Cause of Action (Violation of California Malicious Prosecution Laws), any and all relief permissible under state law;

5.  On each cause of action, pre-judgment interest to the extent permitted by law;

6.  Grants Plaintiffs such further relief as the Court may deem just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand trial by jury of all issues so triable under law.

Dated: August 28, 2025

Respectfully Submitted,

HACKETT LAW PC

*/s/ Kimberly S. Hackett*
Kimberly S. Hackett

Attorney for Plaintiffs

COMPLAINT